THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILLY JOE DEAVERS, Defendant-Appellant.

Fourth District No. 4—90—0766

Opinion filed October 24, 1991.

GREEN, J., specially concurring.

Daniel D. Yuhas and John Anthony Palombi, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Defendant, Billy Joe Deavers, was convicted by a jury of two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(c)(1)) and sentenced to concurrent four-year prison terms on each count. Defendant appeals, arguing (1) the trial court erred by admitting testimony of the victim's out-of-court statements, (2) the jury instructions failed to include a mental state, and (3) the State introduced irrelevant and inflammatory evidence that deprived defendant of a fair trial.

We affirm.

## I. FACTS

Defendant was indicted in July 1989. Count I of the indictment alleged that he committed the offense of aggravated criminal sexual abuse between September 1 and December 31, 1988, in that he committed an act of sexual conduct with C.D., involving his hand and the vagina of C.D., at a time when he was over 17 years of age and C.D. was under 13 years of age. Count II alleged the same acts, only this time they were alleged to have occurred between January 1 and March 31, 1989.

In January 1990, the State filed a supplemental answer to the defendant's motion for discovery in which the State indicated, pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 115—10), that it intended to call Jeff Elston and Brian Corley to testify about what C.D. told them concerning the sexual contact between her and defendant. In September 1990, immediately prior to the commencement of defendant's jury trial, the court conducted the hearing required by section 115—10 of the Code and determined that both Elston and Corley would be permitted to testify about what C.D. told them.

Elston then testified before the jury that he was a detective with the McLean County sheriff's police and he met with C.D. at her school in Bloomington on May 5, 1989. C.D. was then five years old. Also present at that meeting were two investigators from the Illinois

Department of Children and Family Services (DCFS) and the school's principal. Elston informed C.D. that they had information that defendant, her stepfather, "had been touching her inappropriately" and that they needed to talk to her about that. To assist C.D., Elston brought four anatomically correct dolls to the interview. Two bigger dolls were to represent adults and two smaller dolls were to represent children; one of each size doll was male and the other was female.

C.D. told Elston that defendant had touched her "in a manner that she didn't like," demonstrating on the doll that defendant had touched the area of C.D.'s vagina with his hand. C.D. indicated that defendant had done this to her between 5 and 10 times. The best she could remember was that it occurred approximately three months prior to Christmas 1988. C.D. told Elston that she did not like defendant touching her in that manner and that she was scared of him. In response to Elston's question, C.D. stated that she had never been hit or disciplined so as to leave any bruises or marks on her person.

On May 8, 1989, Elston questioned defendant, who denied any sexual contact with C.D. Defendant initially stated that he had never lain in bed with C.D. nor on top of her, and that the extent of his physical contact with C.D. was that he would lean over to kiss her goodnight when he put her to bed. However, toward the end of this interview, defendant recalled that about a month earlier, he had lain down with C.D. for a "discipline purpose" because she had been "messing around with the stereo." Defendant said that his doing so was not "in a sexual gratification manner."

Four days later, on May 12, 1989, Elston again interviewed defendant, who then recalled some other incidents. Defendant recalled one incident where he walked into the bathroom while C.D. was bathing, and he became sexually excited because he noticed that she was developing breasts. Defendant also mentioned another incident where he and his wife were sexually active in the bedroom when his wife asked if he had tucked C.D. into bed and told her goodnight. After he told his wife he had not, he went into C.D.'s bedroom to do so. He told Elston that as he did so, he was still sexually excited and aroused.

Corley testified that he was a school psychologist employed at the time of trial by the University of Illinois. In the spring of 1989, he worked with the Bloomington school district to do case study evaluations of certain children to determine their intellectual and cognitive functioning and their academic achievement. He conducted these studies to help make recommendations for the next year's school placement.

On May 4, 1989, as part of this contract, Corley met with C.D. at her school and conducted an evaluation of her that lasted 1½ hours. C.D.'s mother, Anita Deavers, brought C.D. to the evaluation and chose to go home and come back later to pick up C.D. In May 1989, C.D. was completing kindergarten. Corley testified that about 30 minutes into the evaluation, C.D. "spontaneously started talking about her home life." C.D. told Corley that she was always getting in trouble and being spanked or sent to the corner or put in bed. In her conversation with Corley, C.D. referred to her father as a "wimp." When asked what wimps do, C.D. explained that " 'wimps make you stand in the corner or go to your room.' " When Corley asked if C.D. liked it when she was sent to bed, she said, " 'No, because my dad lays on top of me.' " Corley then asked her if "dad touched her in bed," and she indicated that he did on the cheek, mouth, and leg. When Corley asked her to show him what places she meant, she hesitated but then "indicated all those [places] and also the pelvic region." C.D. demonstrated how defendant touched her by rubbing one of her fingers up and down in the area of her vagina. When Corley asked C.D. if she needed any help because of all this, she said no, because she "was afraid that her dad would get in trouble." C.D. then indicated to Corley that they should get back to what they previously were doing, so Corley finished his evaluation. C.D. made no further reference to Corley of any type of contact with defendant.

The next morning, Corley called DCFS and told them what C.D. had told him. Since that time, he had not had any further contact with C.D.

C.D. testified at trial that she was 7½ years old and in the second grade. When she was in kindergarten, she lived in a trailer in Bloomington with defendant, her mother, and her three brothers and sisters. She testified that there were times when she was in bed in the trailer that defendant would come into her bedroom and touch her in places that she did not like. She was able to recall one incident before Christmas and another around Easter. These incidents occurred at night when she was wearing a nightgown and underpants. Defendant, while wearing only underwear, would get into C.D.'s bed. When asked where defendant would touch her, C.D. said, "touch me in parts that he is not supposed to. *** My pee-pee and, um, that's all." On further questioning, C.D. explained that her "pee-pee" was between her legs, the part of her she uses "to go to the bathroom." C.D. testified that defendant did not put his fingers underneath her underpants when he touched her.

C.D. testified that she told her mother about defendant's touching her, but C.D. could not remember when she did so. C.D. also remembered telling a man at school who was giving her some tests. She said she told the man because she wanted some help from him—"for it to stop." She did not like it when defendant touched her there, and it made her feel bad.

C.D. also remembered showing some people who brought dolls to the school what defendant had been doing to her. She testified that everything she showed those people had really happened between her and defendant.

C.D. testified that defendant was never mean to her by hitting her or hurting her, other than touching her where she did not want him to. She indicated that she had no wish to want to get back at him or hurt him. She further testified that she did not want defendant to get into trouble, but she wanted "to make sure it stopped and he does not do it again."

C.D.'s mother, Anita Deavers, testified that she married defendant in December 1985 and they were currently living together in Bloomington. She and defendant had lived together before they were married. When she first met defendant, she had two children, C.D., who was not quite a year old, and C.D.'s older brother. Anita said that defendant was 32 years old at the time of trial.

Anita testified that in May 1989, she took C.D. to school to receive an evaluation. After that evaluation, Anita said she first became aware of the allegations C.D. made against defendant. Anita testified that she never saw defendant touch C.D. in a sexual manner.

Anita also testified that C.D. once told her, when a Catholic Social Services caseworker was present, that C.D. had lied about "the whole thing—that she had made it up." This conversation with C.D. took place sometime after Christmas 1989 at one of Anita's weekly visits with her children, who were then in foster placement.

Anita denied telling Elston that defendant had touched C.D. in a sexual manner or that she was afraid of defendant because of prior incidents in which he physically abused her, including one wherein he hit her with his fist and knocked her unconscious. She also denied telling Elston that if defendant knew she was talking to the police, she was afraid he might kill her. However, she admitted telling Elston that defendant had told her not to talk to the police because anything she said could be used against him.

Anita then identified a document that contained questions she was asked and answers she gave to Elston on June 26, 1989. When Anita was confronted with specific questions and answers from that docu-

ment, she claimed not to have given the answers. She did acknowledge, however, that she signed the two-page document on both its first and second pages.

Anita was similarly confronted with statements she gave to Ellen Schroeder of the McLean County sheriff's department which were to the same effect as the statements she made to Elston. Anita also admitted that she testified in a previous hearing that there was one incident in which she saw defendant sexually abuse C.D.

Ellen Schroeder of the McLean County sheriff's department testified that on May 11, 1989, she assisted Elston in questioning defendant. She testified that defendant told her that on many occasions he would crawl into C.D.'s lower bunk bed in order to kiss her goodnight. He also said he would occasionally get into bed with her to discipline her when she had done things that made him angry. Defendant told Schroeder that he would stay in bed with C.D. approximately five minutes at a time, and that he would be wearing underwear or gym shorts at the time. He also told Schroeder that on occasion C.D. would be asleep against the wall and he would end up lying on top of her.

Schroeder testified that when she first started questioning defendant, he denied any type of sexual contact with C.D. Later during that same conversation, he admitted there were times when he was sexually aroused, such as once when defendant had been having sexual relations with his wife and she asked him to go into C.D.'s bedroom to kiss her goodnight. Defendant said he did so and that he had an erection when he crawled into bed with C.D. He also admitted to Schroeder that once when he saw C.D. nude in the shower, " 'it excited him.' "

Schroeder testified that she interviewed Anita, who stated that she had seen defendant paying a lot of attention to C.D. and " 'rubbing [C.D.'s] front.' " Anita believed that he may have been rubbing C.D.'s crotch area. Anita also told Schroeder that she wanted to make sure defendant did not know she was at the sheriff's department because Anita was afraid he would kill her. She told Schroeder that defendant had asked her not to speak to anybody at the sheriff's department.

The State recalled Elston, and he testified that he asked Anita whether she had ever seen defendant touch C.D. in a sexual manner. Anita told Elston that she saw defendant do so on one occasion: While they were sitting in the living room of their trailer watching TV with C.D. on defendant's lap, defendant " 'moved his hand toward her groin area and started to rub her in the crotch or vagina area.' "

Anita described defendant's touching C.D. as the same actions he used in touching Anita when he was sexually aroused. Anita told Elston she did not come forward before with that information because she was scared of defendant due to his beating her in the past. She told Elston that defendant told her not to speak to the police and she feared that if he knew she had, he might kill her.

The written statement Elston obtained from Anita (with which Anita had earlier been confronted at trial) was given to Anita on June 26, 1989, with instructions that she read it over and make any corrections, additions, or deletions she would like. Elston testified Anita read the document, made no corrections, and signed it at the bottom of each page. Anita's written statement was then received into evidence pursuant to section 115—10.1 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1).

After the State rested, defendant called Robin Marshall to testify. Marshall said she was a caseworker with Catholic Social Services and had worked with C.D. for about seven or eight months after June 1989, when C.D.'s allegations first became known. Around Thanksgiving or Christmas 1989, when Marshall was transporting C.D. to visit her mother, C.D. said to Marshall, "Why can't I go home, I lied about it anyway." At the time, C.D.'s older brother was in the car and C.D. was talking with him about making visits to see their mother. No one was in the car besides Marshall and the two children.

Later that same day, C.D. again told Marshall that she had lied "about the whole thing." Marshall also testified that at the time of this conversation, C.D. had been in several different foster homes and separated from her brothers and sisters. Marshall testified that C.D.'s statements were made right before the holidays of Thanksgiving and Christmas and C.D. was getting very homesick. Marshall also testified that during C.D.'s later visit with Anita, C.D. said, "Mom, can I go home, now that I said I lied?" After Marshall explained to C.D. that just because she said she lied, she would not be going home, C.D. never again said she lied and made it all up.

Defendant testified and denied that he ever had any sexual contact with C.D. He explained that the officers who testified about his conversations with them must have misunderstood what he said. He specifically denied telling Schroeder that he became sexually aroused when he saw C.D. in the bathroom.

On the foregoing evidence, the jury convicted defendant of both counts of aggravated criminal sexual abuse.

## II. Admissibility Under Section 115—10 Of The Victim's Hearsay Statements

As stated previously, the State called two witnesses, Elston and Corley, to testify about statements C.D. made to them concerning defendant's sexual contact with her. The court admitted these statements pursuant to section 115—10 of the Code, which reads as follows:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.

(d) The proponent of the statement shall give the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement." Ill. Rev. Stat. 1989, ch. 38, par. 115—10.

In accordance with section 115—10(b)(1), the court conducted a hearing outside the presence of the jury to determine if "the time,

content, and circumstances of the statement[s] provide sufficient safe-guards of reliability." (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(b)(1).) Elston and Corley testified at that hearing substantially as we have described their later testimony before the jury. After the court heard Elston's testimony, it overruled defendant's objection to the admissibility of that testimony under section 115—10 and made the following findings:

> "Well, from what the Court has heard thus far about the statements made by the victim to the officer, I guess the Court doesn't have any problem about those meeting the requirements at this point of section 115—10(b)(1). It appears the statements were received in a neutral or friendly environment even as far as the victim is concerned, at school in a meeting room there, with at least someone that she knew from the past and presumably in a good context, the principal, and one of the people who were there. It doesn't seem to the Court that the interview was conducted in a suggestive way, but rather the victim was given the opportunity to explain what it was that occurred and even demonstrate that as opposed to being prompted to give specific type answers to suggestive questions. And it—although there may be as suggested here some inconsistencies, it seems to the Court that the statement would be—the statement made to Officer Elston would be able to be presented to the jury."

After hearing Corley's testimony, the court overruled defendant's objection to its admissibility and explained its ruling as follows:

> "Well, there is no question it is hearsay. The question is whether it is admissible under 115—10. It seems to the Court a couple things here. One is that this meeting between this last witness, Mr. Corley, and the victim took place one day prior to the meeting with Officer Elston and the others. And what she described as the sexual contact between the male and herself and her demonstration of that was consistent both times.
>
> The purpose initially at any rate of the May 4th meeting had to do with school activities and school academic achievement. It had nothing to do with any incident such as this. But the victim apparently wandered off the purpose for the meeting and into other areas initially that resulted in follow-up questions by the gentleman who was there for the purpose of testing.
>
> I think the Court's view would be that this being also in a neutral or friendly environment, at the school, and there not

being any unnecessarily or improperly suggestive questions, it seems to the Court that this information as far as what the victim told this individual would be admissible evidence for the jury's consideration as well. So the Court thinks that is appropriate also."

On appeal, defendant argues that the trial court erred in permitting both Elston and Corley to testify under section 115—10 of the Code about C.D.'s statements to them. The gist of defendant's argument is that the "time, content, and circumstances" of C.D.'s statements do not provide sufficient safeguards of reliability as required in section 115—10(b)(1) of the Code. For instance, defendant argues that in C.D.'s conversation with Corley, she called her father a "wimp" and said "wimps punish little girls and send them to their rooms." Later in that conversation, C.D. told Corley that defendant got into bed with her and would touch her in various places, including her crotch area. Based upon this sequence of events, defendant claims that "[t]he circumstances of this statement are suspect, given that she made them directly after making derogatory statements about [defendant] to Corley." Defendant cites other circumstances that he claims adversely affect the reliability of C.D.'s statements, such as that Corley allegedly initiated the discussion of whether defendant touched her while he was in bed with her and that C.D. was unsure about when defendant's sexual contact with her occurred.

Defendant argues that C.D.'s statements to Elston are unreliable because of the large number of authority figures present in the principal's office when the statement was given. Defendant maintains that the presence of Elston, two DCFS workers, and the principal "was conducive to [C.D.'s] repeating the same story she had given Corley the previous evening, regardless of its truth." Defendant also complains that Elston's mode of questioning was occasionally leading and that the trial court was mistaken in its characterization that C.D.'s statement was given "in a friendly atmosphere."

In support of his arguments, defendant cites *People v. Zwart* (1990), 208 Ill. App. 3d 407, 567 N.E.2d 373, *appeal allowed* (1991), 137 Ill. 2d 672, 571 N.E.2d 155, in which the First District Appellate Court reversed a conviction of aggravated criminal sexual assault on the ground that the trial court improperly admitted hearsay statements of the victim under section 115—10 of the Code. (*Zwart*, 208 Ill. App. 3d at 412, 567 N.E.2d at 376.) The court in *Zwart* explained its decision as follows:

"We find that the statements are inadmissible because the facts in the case at bar indicate that there were insufficient

safeguards of reliability with respect to the *timing* of the allegations and with respect to *circumstances* under which the allegations were made. There were insufficient safeguards of reliability with respect to the timing of the declarations because during the physical examination and the subsequent interview the victim failed to identify anyone as having sexually abused her. Furthermore, there was a time lapse between when the acts occurred and the first time that she allegedly told her mother of the acts. There were insufficient safeguards of reliability with respect to the circumstances surrounding the allegations because [the victim's mother] had had a sexual relationship with defendant, and the allegations were made after [defendant and the victim's mother] quarreled.

The trial judge conducted a hearing to determine the time, content, and circumstances of the statement pursuant to the Code. However, we find that the time and circumstances of the statement provide insufficient safeguards of reliability because of the time lapse, [*sic*] between when the acts occurred and the first time the victim told her mother about the acts. The child failed to allege sexual abuse during the physical examination on June 30 [five days after defendant allegedly sexually assaulted the victim] or during the interview which followed. Therefore, the statements are inadmissible pursuant to section 115—10 of the Code." (Emphasis in original.) *Zwart*, 208 Ill. App. 3d at 412, 567 N.E.2d at 376.

We disagree with the *Zwart* court's decision and its analysis of section 115—10 of the Code. First, the *Zwart* court, while reversing the trial court's determination that "there were insufficient safeguards of reliability" to justify the admission of the victim's statements under section 115—10 of the Code, never states what standard of review it employed in reaching that conclusion. Clearly, a court of review cannot be permitted to simply substitute its assessment of the evidence for that of the trial court (which actually saw and heard the witnesses who testified on the issue) when it reviews a trial court determination that hearsay statements are admissible under section 115—10 of the Code. We hold that the appropriate standard of review on this issue is the following: Was the trial court's determination clearly contrary to the manifest weight of the evidence? We note that this is the same standard of review generally applicable to findings made in criminal cases other than the guilt or innocence of the accused. See *People v. Newbern* (1991), 219 Ill. App. 3d 333, 359 (applying this standard of review when considering defendant's claim that

the jury should have found defendant proved the presence of a mitigating factor, so as to reduce his conviction from first degree murder to second degree murder); *People v. Jackson* (1991), 145 Ill. 2d 43, 102 (applying this standard of review when considering defendant's argument that the trial judge, when resolving a *Batson* question involving jury selection (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712), erroneously determined that the prosecutor's explanations were credible).

We also disagree with the weight accorded by the *Zwart* court to the time lapse between the victim's statements and the defendant's criminal behavior. We do not believe that the word "time" as used in section 115—10(b)(1), to be considered when the court assesses the reliability of the victim's hearsay statement, means simply the length of the duration of the time lapse between the criminal conduct and the statement, especially when very young children are involved. Instead, we believe the focus of the court under section 115—10(b)(1) of the Code should be on events that may have occurred during the time lapse in question, whatever its duration may have been, that could adversely affect the statement's reliability.

We further disagree with the weight given by the *Zwart* court to (1) the victim's failure to identify the alleged perpetrator of the sexual assaults, and (2) the victim's allegations being made after the victim's mother and the defendant had quarreled.

■ We agree with the United States Supreme Court's view that no mechanical test for determining particularized guarantees of trustworthiness or reliability of a victim's hearsay statements is appropriate. (*Idaho v. Wright* (1990), 497 U.S. 805, 822, 111 L. Ed. 2d 638, 656, 110 S. Ct. 3139, 3150.) Instead, trial courts should examine the totality of the circumstances surrounding a victim's statements to determine if they were reliable. In the present case, our review of the record satisfies us that the trial court appropriately did so when it decided to admit the victim's statements under section 115—10 of the Code. The trial court's determination was not clearly contrary to the manifest weight of the evidence.

In so holding, we disagree with defendant's characterization of the circumstances surrounding C.D.'s statements. C.D.'s failure to complain earlier to anyone about defendant's criminal behavior does not necessarily diminish the reliability of her later statements; instead, such delay merely presents a factor for the trial court to consider when evaluating the totality of the circumstances. We agree with the observation of the court in *People v. Priola* (1990), 203 Ill. App. 3d 401, 414, 561 N.E.2d 82, 92, that "the failure of a young sex-

ual assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances." In the present case, C.D.'s delay in reporting defendant's criminal behavior may be further explained by C.D.'s awareness that her own mother failed to stop defendant's criminal conduct when C.D. knew her mother was aware of that conduct.

Furthermore, we disagree with the weight defendant attaches to the fact that C.D.'s statements were partially in response to questions asked by Corley and Elston. Again, we view that as just one factor for the trial court to consider when it evaluates the totality of the circumstances and determines the admissibility of C.D.'s statements under section 115—10 of the Code. *People v. Morton* (1989), 188 Ill. App. 3d 95, 104, 543 N.E.2d 1366, 1372.

For the reasons stated, we affirm the trial court's determination that C.D.'s hearsay statements to Corley and Elston were admissible under section 115—10 of the Code.

### III. Jury Instructions Were Proper Even Though They Contained No Mental State

■ Defendant next argues that as a matter of State and Federal constitutional law, his convictions must be reversed because the jury instructions for these offenses fail to include a mental state. This court has recently addressed and rejected this same argument (see *People v. Burton* (1990), 201 Ill. App. 3d 116, 122, 558 N.E.2d 1369, 1374; *People v. Smith* (1991), 209 Ill. App. 3d 1043, 1060-61, 568 N.E.2d 482, 493; *People v. Lemons* (1991), 210 Ill. App. 3d 33, 42, 568 N.E.2d 1380, 1385-86), and we are not prepared to overrule those decisions. Regarding the Federal constitutional claims, we agree with the State that this argument is totally without merit. The cases defendant cites in support of this argument, *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, and *Francis v. Franklin* (1985), 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965, both dealt with the use of evidentiary presumptions in jury instructions. That issue is not present in this case, and nothing in those cases remotely supports the argument defendant makes to this court.

Although not necessary to our resolution of this issue, we note nonetheless that defendant in the present case was convicted of aggravated criminal sexual abuse based upon an allegation that he committed an act of *sexual conduct*; the defendant in *Burton*, which is the case defendant primarily cites in support of his argument, was convicted of aggravated criminal sexual assault based upon a charge that

he committed an act of *sexual penetration.* (*Burton,* 201 Ill. App. 3d at 118, 558 N.E.2d at 1371.) The definition of sexual conduct in section 12—12(e) of the Criminal Code of 1961 (Criminal Code) speaks of "any intentional or knowing touching or fondling *** for the purpose of sexual gratification or arousal." (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(e).) On the other hand, the definition of sexual penetration contained in section 12—12(f) of the Criminal Code contains none of the references to a mental state that the section 12—12(e) definition of sexual conduct contains. (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f).) Thus, on this basis alone, the discussion in *Burton,* regarding mental states when sexual penetration is alleged, does not apply to a similar discussion regarding mental states when sexual conduct is alleged.

### IV. TRIAL COURT PROPERLY REFUSED TO ADMIT THE LETTER FROM DEFENDANT'S WIFE INTO EVIDENCE BECAUSE IT WAS NOT A PRIOR CONSISTENT STATEMENT

During the course of Anita's testimony, defense counsel attempted to have her testify about a three-page note she wrote on August 9, 1989. In that note, Anita wrote that defendant was "telling the truth about [C.D.]" and, based upon Anita's reading of the police reports pertaining to the case, "it does not sound like [defendant] did anything to [C.D.]." The note also suggested that someone else might have engaged in this sexual conduct with C.D.; specifically, C.D.'s biological father. The trial court sustained the State's objection to this testimony. Defendant then made an offer of proof and argued that the letter was admissible as a prior consistent statement that corroborated Anita's denials before the jury. Defendant argues that because Anita was impeached by prior inconsistent statements she gave to police officers, he was entitled to bring out this prior consistent statement. We disagree.

The evidence before the trial court on this issue established that the police questioned both C.D. and defendant in May 1989. On June 23, 1989, both Elston and Schroeder questioned Anita at the McLean County sheriff's department. On June 26, 1989, Elston questioned her again and obtained her signature on the two-page document in which Anita said she saw defendant touch C.D. in a sexual manner by sliding his hand down in C.D.'s groin area. In Anita's oral statements on June 23 to Elston and Schroeder, she expressed fear of what defendant would do to her if he knew she was talking to the police about these matters. On June 28, 1989, defendant was arrested on this charge, posted a cash bond, and obtained his release from jail. On

July 20, 1989, defendant was indicted. Then, on August 9, 1989, Anita wrote the three-page statement in question.

When Anita was cross-examined during the hearing on defendant's offer of proof regarding her August 9 note, she acknowledged that the police had already been investigating C.D.'s allegations and that juvenile court proceedings had already started regarding all of her children. In addition, Anita's testimony at trial that she had never seen defendant engage in sexual conduct with C.D. was consistent with her August 9 note.

The trial court denied defendant's offer to place Anita's August 9 letter before the jury and explained its ruling as follows: "[The August 9 note] doesn't constitute a prior consistent statement and really it seems to consist of not much more than opinions of the witness on various matters." We agree.

Professor Michael H. Graham explains the use of prior consistent statements as follows:

> "[T]o rebut an express or implied charge that the witness is motivated or has been influenced to testify falsely or that his testimony is a recent fabrication, evidence is admissible that he told the same story *before* the motive or influence came into existence or *before* the time of the alleged fabrication." (Emphasis in original.) M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14, at 425 (5th ed. 1990).

In *People v. Wheeler* (1989), 186 Ill. App. 3d 422, 542 N.E.2d 524, this court also discussed the standards governing the admissibility of prior consistent statements and wrote the following:

> "Evidence of a prior statement of a witness consistent with that witness' testimony at trial is admissible to bolster the testimony of that witness only if charges have been made that the testimony of the witness is of recent fabrication or that the witness has a motive to commit perjury, *and* the prior consistent statement was made before (1) the time of the fabrication; or (2) the existence of the motive to lie. [Citation.] Otherwise, the testimony is inadmissible." (Emphasis in original.) *Wheeler*, 186 Ill. App. 3d at 426-27, 542 N.E.2d at 526.

■ The State concedes that the testimony of Elston and Schroeder in the present case implied that Anita's trial testimony was either of a recent fabrication or the result of a motive to commit perjury. Defendant argues that this concession is sufficient to render her August 9 note admissible because "[i]f [Anita] made the statement before the recent fabrication (her trial testimony), then the statement is admissible." Defendant's argument is mistaken. As the State cor-

rectly points out, the proponent of the prior consistent statement must *additionally* show that the declarant made the statement before the time of the fabrication or the existence of the motive to lie arose. Defendant has failed to show either in the present case.

The sequence of significant events pertaining to this issue may be stated as follows: (1) after C.D. and defendant are interviewed by the police in May 1989, Anita gives her statements to the police on June 23 and 26, 1989, which incriminate defendant; (2) on June 26, defendant is first charged with these offenses and bonds out of jail; (3) juvenile court proceedings are undertaken regarding C.D. and Anita's other three children, ultimately resulting in the placement of all of them in foster homes; (4) on August 9, 1989, Anita writes her exculpatory note; and (5) in September 1990, Anita's testimony before the jury is exculpatory of defendant in a fashion consistent with her August 9 note. This sequence demonstrates that sometime prior to or on August 9, 1989, Anita changed her story for reasons about which one can only speculate. The record contains no evidence, however, that her motivation to testify inconsistently in September 1990 with her June statements to the police was any different than her motivation in August 1990 to write a note that was inconsistent with her June statements to the police. Thus, defendant has failed to demonstrate that Anita's August 9 note is admissible as a prior consistent statement.

So as to clarify our decision, we need only point out that had Anita written her note on *June* 9, instead of *August* 9, then that June 9 statement would have met all of the criteria we have discussed to be admissible as a prior consistent statement after the State at trial impeached Anita's testimony with her inconsistent statements of June 1989.

### V. Defendant Was Not Improperly Prejudiced By Certain Evidence Admitted At Trial

Defendant last argues that the State introduced certain extremely prejudicial evidence at trial that inflamed the jury against him. In making this argument, defendant points to three specific types of evidence. We will address each in turn.

#### A. *Evidence That Defendant Physically Abused His Wife*

Defendant argues that the trial court improperly admitted evidence that he had abused Anita in the past, claiming this evidence was admitted only to show that defendant had the propensity to commit crime. We disagree. The State questioned Anita about defendant's

past physical abuse of her only after, when called by the State, she testified inconsistently with statements she had previously given investigating officers, in which she incriminated defendant. The State argues that these questions were utilized by the State to show the jury that Anita was afraid of him, perhaps explaining why she changed her testimony from what she had previously told the police. (See *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823-24.) We see no abuse of discretion in the trial court allowing the State to use this evidence of abuse for this limited purpose.

### B. *Evidence That Defendant's Children Were in Foster Homes*

Defendant next complains about Marshall's testimony that defendant's other children were in foster homes and separated from C.D. Defendant argues that the prejudicial effect of this evidence outweighed its probative value because the jury may have speculated that C.D.'s siblings had been removed from the parental home because defendant had also done something bad to them in the past. We are unpersuaded.

The evidence was clearly probative because it helped to explain why C.D. was unhappy and homesick just prior to the 1989 holidays and why Marshall was driving C.D. and her older brother to visit with their mother. This latter explanation was particularly important because it placed C.D.'s recantation of her allegations against defendant in an appropriate context. In the heart-wrenching circumstances in which that recantation occurred, the motive behind C.D.'s recantation appears self-evident as she says to her mother on her supervised visit, "Mom, can I go home, now that I said I lied?"

Furthermore, we do not share defendant's view that the jury might speculate that he must have done something bad to C.D.'s siblings in order to account for why they would have been removed from his home. Instead, we think it much more likely that the jury will understand that when a stepfather has been charged with sexually abusing his then five-year-old stepdaughter and the child's mother continues to live with the stepfather and appears to be on his side, a court is likely to view skeptically the fitness of that home for *any* child, not just the child who made the allegations.

### C. *Evidence That Defendant Was Sexually Aroused by the Victim*

Defendant last argues that the trial court improperly permitted some State witnesses to testify that defendant told them of two occa-

sions where he was in a state of sexual arousal in C.D.'s presence. In support of this argument, defendant states the following:

> "These statements have absolutely no connection to the activities that the defendant was accused of, and again could only be used to inflame the jury against [him].
>
> *** The evidence that the defendant may have been sexually aroused in the presence of his daughter is not relevant to the issue of whether, during the time period in question, the defendant engaged in an act of sexual conduct with [C.D.]
>
> *Even if this evidence is assumed to be true, it does not make the occurrence of sexual contact between [defendant] and [C.D.] any more likely. There is no indication that these alleged incidents were related to the present charges."* (Emphasis added.)

We emphatically disagree with this argument because it seems to suggest the strange notion that there is nothing at all unusual or revealing about a 32-year-old man who becomes sexually aroused when he sees his five-year-old stepdaughter naked in the bathroom. Instead, we view the evidence in question as strongly probative and suggestive of the state of mind that would be inclined to commit the acts that C.D. complained of. In so holding, we find instructive the recent decision of the Missouri Court of Appeals in *State v. Lachterman* (Mo. App. 1991), 812 S.W.2d 759, in which the court was reviewing the admissibility of evidence that defendant, who was charged with sodomizing 9- and 10-year-old boys, had committed sodomy with other children at different times and places, and had possession of magazines, photographs, and newspaper articles pertaining to sexual acts with children. In holding this evidence to be admissible, the court wrote the following:

> "[' "]Certain crimes today are recognized as stemming from a specific emotional propensity for sexual aberration. The fact that in the near past one has given way to unnatural proclivities has a direct bearing upon the ultimate issue whether in the case being tried he is guilty of a particular unnatural act of passion. The importance of establishing this fact far outweighs the prejudicial possibility that the jury might convict for general rather than specific criminality. Even granting the general rule of inadmissibility of evidence of independent crimes to prove the offense charged, many courts recognize a limited exception in the area of sex crimes to prove the nature of the accused's specific emotional propensity.[" ' *State v. Taylor* (Mo. Ct. App. 1987),

735 S.W.2d 412, 415, quoting *State v. McDaniel* (1956), 80 Ariz. 381, 388, 298 P.2d 798, 802-03.]

\* \* \*

\*\*\* The crucial question is one of relevance—does proof that the defendant committed another crime logically tend to prove he committed the charged offense? Although it cannot be denied that the admission of such evidence may be prejudicial because it may result in a conviction founded upon crimes other than the charged offense, 'relevance, not prejudice, is the touchstone of due process and . . . the question of whether the prejudicial effect outweighs its probative value rests within the sound discretion of the trial court.' (*State v. Trimble*, 638 S.W.2d 726, 732 (Mo. banc 1982).)

\* \* \*

We view [defendant's deviate sexual] conduct as so unnatural and depraved that regardless of the relationship or similarity of status between the victim and other children subjected to like sexual abuse by the defendant, evidence that the defendant engaged in similar acts of sexual abuse of children of the same sex as the victim near in time to the acts charged tends to prove the defendant's guilt of the crime on trial. Evidence of repeated acts of sexual abuse of children demonstrates, per se, a propensity for sexual abberation and a depraved sexual instinct and should be recognized as an additional, distinct exception to the rule against the admission of evidence of uncharged crimes.

We are not unmindful of the prejudicial impact upon a jury of evidence that a defendant has committed other crimes. For that reason we emphasize that what we say here should be narrowly construed. It is not our intention to open the door for the admission of evidence of any type of sexually aberrant behavior on the part of defendant. \*\*\*

Consequently, we limit our finding of relevance and probative value to other acts of sexual abuse of children of the same sex as the victim occurring near in time to the acts charged. It is the recurrent and continuing penchant for engaging in sex with children that demonstrates such deviance and depravity as to give significance to the uncharged conduct. The trial court did not err in admitting evidence of defendant's sexual abuse of boys other than the victim or of his possession of magazines and photographs depicting children engaged in sexual conduct." *Lachterman*, 812 S.W.2d at 766-69.

■ At one point in the *Lachterman* decision, the court refers to the new evidentiary rule it is proposing as " 'the depraved sexual instincts doctrine.' " (*Lachterman*, 812 S.W.2d at 766, quoting *Taylor*, 735 S.W.2d at 417.) We believe that title nicely summarizes the rule of relevancy the doctrine embodies, and we find the doctrine applicable and useful to our rejection of defendant's argument regarding the claimed irrelevancy of his being sexually aroused by C.D. To paraphrase *Lachterman*, defendant's sexual arousal in the presence of C.D. demonstrates such deviance, perversity, and depravity so as to make it substantially more likely than not that he would have a penchant for engaging in the sexual conduct with her that she complained of.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

LUND, P.J., concurs.

JUSTICE GREEN, specially concurring:

I concur in the decision to affirm and agree the circuit court ruled properly in admitting the hearsay statements pursuant to section 115—10 of the Code.

I disagree with the decision of the majority to pass upon the propriety of the appellate decision in *Zwart* because that case is now before the Illinois Supreme Court. The decision of the latter court will be definitive. However, an affirmance in *Zwart* would not necessarily require reversal here. As the majority has concisely shown, evidence was introduced there that (1) one of the children denied to a therapist that she had been molested and failed to mention the molestation to a treating physician, and (2) the allegations were made after a quarrel between the children's mother and her lover, the defendant. The evidence of reliability here is substantially stronger. We need not pass upon the propriety of *Zwart* to affirm.

I agree with the majority in regard to the standard of review of factual determinations by the trial court in rulings upon section 115—10 hearings to determine admissibility. We must also remember that questions of law are also involved in that decision. Here, as would usually be the case at a section 115—10 hearing, the court did not hear the declarant children. Only in determining the existence of the underlying circumstances is the court making a purely factual determination. After viewing underlying facts most favorably to the circuit

court's determination, a reviewing court should give somewhat less deference to the decision as to whether those circumstances "provide sufficient safeguards of reliability." Here, the circuit court made a clear explanation of its decision which was fully supported by the evidence and the law.

I agree that the evidence of defendant becoming sexually aroused when viewing the victim naked was admissible to show intent or motive. The evidence is analogous to evidence of prior acts of sexual assault or abuse by the accused against the same victim. (*People v. Whitham* (1950), 406 Ill. 593, 94 N.E.2d 506.) To the extent the majority opinion implies that evidence would be admissible if it shows arousal of a man accused of a similar offense while viewing naked young girls other than the victim, I do not join in the opinion. Many problems are invoked with such a rule. The issue has not been briefed and we should not create *dictum* in regard to it.