# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Groel*, 2012 IL App (3d) 090595

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD C. GROEL, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-09-0595 |
| Modified Rule 23 filed | May 24, 2012 |
| Motion to publish allowed | June 11, 2012 |
| Opinion filed | June 11, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where it was alleged that a foster child was the victim of a criminal sexual assault, evidence of uncharged other crimes by the defendant against other foster children was admissible to show a pattern of conduct relevant to defendant's motive and propensity when interacting with the female teenaged, foster children while those children were left under the supervision of defendant's wife, and defendant opened the door to admission of his previous misdemeanor conviction of endangering the health or welfare of a child by failing to admit to that offence when responding to the prosecutor's inquiry regarding his previous convictions. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 08-CF-403; the Hon. Stephen Kouri, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Jay Wiegman (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Stewart Umholtz, State's Attorney, of Pekin (Terry A. Mertel and Laura E. DeMichael (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE WRIGHT delivered the judgment of the court, with opinion.

Presiding Justice Schmidt and Justice McDade concurred in the judgment and opinion.

**OPINION**

¶ 1    On July 31, 2008, a Tazewell County grand jury indicted defendant for multiple counts of criminal sexual assault involving three different minors and one count of endangering the health or life of a child. The court granted the State's pretrial motions to introduce evidence of other uncharged sexual conduct and to allow the State to use certain prior criminal convictions for impeachment purposes in the event defendant chose to testify. Defendant was convicted of one count of criminal sexual assault and acquitted of all other charges.

¶ 2                                    FACTS

¶ 3    On July 31, 2008, a Tazewell County grand jury issued a six-count bill of indictment. Count I alleged that between August 1, 2001, and August 31, 2005, defendant committed the offense of criminal sexual assault against T.A., who was at least 13 but under 17 years of age, by forcibly placing his penis in her anus. Count II alleged that between August 1, 2001, and August 31, 2005, defendant held a position of trust, supervision, or authority over T.A. and committed the offense of criminal sexual assault against T.A. by placing his penis in the vagina of T.A., who was at least 13 but under 18 years of age.

¶ 4    Count III alleged that between June 1, 2003, and October 31, 2004, defendant committed the offense of criminal sexual assault against S.N., who was at least 13 but under 17 years of age. Count IV alleged that between June 1, 2003, and October 31, 2004, defendant committed the offense of criminal sexual assault against S.N., who was at least 13 but under 18 years of age. Count V alleged that between August 1, 2006, and December 31, 2006, defendant committed the offense of criminal sexual assault against A.P., who was at least 13 but under 18 years of age. Count VI alleged that between June 1, 2003, and October 31, 2004, defendant committed the offense of endangering the life or health of a child by providing alcoholic beverages and drugs to S.N.

¶ 5        On August 29, 2008, the State filed a pretrial motion *in limine* seeking to admit evidence of uncharged sexual conduct involving an ongoing, long-term sexual relationship with D.C., born August 20, 1991, which began in approximately 2005. The State intended to introduce this evidence to show defendant's propensity, intent and motive to commit the offenses charged in this case. On September 8, 2008, defendant filed a motion *in limine* seeking to preclude the State from offering evidence of this uncharged conduct and other prior convictions.

¶ 6        On September 10, 2008, the court conducted a hearing on the State's motion *in limine*. The State called Jeffrey Little, a Pekin police officer and a liaison officer at the Pekin Community High School, who testified that in February 2008, he conducted a traffic stop on a motor vehicle leaving the Pekin Community High School after receiving information that an older gentleman would be picking up D.C., a high school student, without her foster mother's permission. Little discovered defendant driving the vehicle with D.C. in the front passenger seat. D.C. told Little that she had a doctor's appointment for an "abortion check-up."

¶ 7        Angie Huss, a child protective investigator with the Department of Children and Family Services, testified that through her investigation, she listened to recorded telephone conversations and confirmed that the conversations occurred between defendant and D.C. while defendant was incarcerated in jail. The prosecutor played the telephone recordings for the court's consideration.

¶ 8        The State asked the court to find that the proffered evidence showed an ongoing relationship between defendant and D.C. to show that defendant had a propensity to pursue victims of the same age, gender, and situation, being foster children, as the alleged victims in the charged offenses. On September 11, 2008, the trial court entered a written order finding that the State's proffered evidence was admissible.

¶ 9        On October 3, 2008, the trial court conducted a hearing on defendant's motion *in limine* seeking to bar the admission of defendant's prior criminal convictions for the offenses of retail theft, possession of a controlled substance and endangering the health or life of a child, forgery, bad check, theft, and destruction or tampering of evidence. On October 6, 2008, the court ruled that the State could admit evidence of defendant's prior convictions for the offenses of retail theft, possession of a controlled substance and endangering the health or life of a child, forgery and theft for purposes of impeachment only.

¶ 10        On May 26, 2009, defendant filed a motion *in limine*, claiming the State intended to offer evidence of uncharged sexual contact with the alleged victims. Defendant argued that the probative value of such evidence was outweighed by the prejudicial effect. On May 27, 2009, the court heard arguments on defendant's remaining motion *in limine* and ruled that the victims could testify regarding uncharged sexual conduct with defendant.

¶ 11        When testimony began, the State called T.A., who testified before the jury that she was 21 years old, that she was born on August 8, 1987, and that she entered the foster care system at the age of 8. T.A. testified that she was placed with Judy Morris as a foster child when she

was 13 years old. According to T.A., Morris would leave T.A. with Morris's daughter, Cathy, who was married to defendant, at defendant's house while Morris played bingo. T.A. testified that when she was 14 years old, defendant engaged in vaginal intercourse with her at his home. She could not recall what defendant said to her and described being forced because "[h]e just kind of took my clothes off." T.A. said that there were other times that defendant had vaginal intercourse with her.

¶ 12    T.A. said that she told Morris and Cathy, in defendant's presence, about the sexual encounter between T.A. and defendant. However, according to T.A., both Morris and Cathy told T.A. that she "was lying about it." T.A. said that defendant stopped having intercourse with her when she was either 15 or 16 years old after S.N. moved into Morris's residence. She told the jury that she did not report defendant to the police because she was afraid of defendant and Cathy. T.A. said that if she told the police, she did not believe that she would have been moved to a different foster home because by then, Morris had guardianship of her. T.A. said that she left Morris's house on the day she turned 18 years old.

¶ 13    T.A. admitted to having problems with Morris and Cathy but denied wanting to get back at them. T.A. admitted that she pled guilty to battering defendant's child but claimed that it was an accident.

¶ 14    Following T.A.'s testimony, the State played several telephone conversations, between defendant and D.C., which were recorded while defendant was incarcerated at the Tazewell County Justice Center on July 31, 2008, August 20, 2008, and August 27, 2008. During the telephone call on July 31, 2008, defendant told D.C. to watch what she said because their conversation could be recorded. Defendant told D.C., "[K]eep your mouth shut, please. Don't hurt us, okay?" Defendant later said during the same recorded conversation that he loved D.C.

¶ 15    During another telephone call recorded on August 20, 2008, both defendant and D.C. repeatedly said "I love you" to each other. During a telephone call recorded on August 27, 2008, D.C. told defendant that she was "not taking the pill any more" because she did not need it. Defendant asked her what would happen if he was ever released from jail. D.C. said that she would "start taking it again." At the end of the conversation, both defendant and D.C. said "I love you" to each other.

¶ 16    On May 28, 2009, the prosecutor advised the court that S.N. failed to appear in court and dismissed counts III, IV and VI of the bill of indictment. The State rested.

¶ 17    The defense called Judy Morris, who testified that she was the current guardian of D.C., who was now 17 years old. Morris said that T.A. was one of her previous foster children who had lived with Morris during "five years of pure hell." She said that T.A. had to be supervised and that she did not leave T.A. alone. However, she could leave T.A. with her daughter, Cathy, who was a babysitter approved by Catholic Charities. Morris testified that she did not leave T.A. alone with defendant because he was not an approved babysitter.

¶ 18    According to Morris, S.N. also lived with her for a short time beginning in September 2003. When S.N. ran away from her house with T.A. and D.C., the three girls were caught

in Georgia "with weed." Morris refused to take S.N. back into her home at that time. Morris explained that she would not protect defendant and that the girls had not made any complaints to her about defendant.

¶ 19    D.C. testified that she was currently 17 years old, born on August 20, 1991. D.C. said that she was placed with Morris in June 2004. While she lived with Morris, D.C. said that T.A. and S.N. also lived with Morris. D.C. said that T.A. never complained about defendant to D.C. but told D.C., during the summer of 2008, that she was going to get Cathy and defendant back sometime.

¶ 20    D.C. testified that defendant had always been appropriate with her and denied she was having a sexual relationship with defendant. She further testified that she and defendant spoke on the telephone while defendant was incarcerated and often told one another that they loved each other. D.C. said that the reference to birth control pills during one telephone conversation was related to the fact that D.C. took birth control pills after having an abortion.

¶ 21    Following D.C.'s testimony, the prosecutor advised the court that S.N. had appeared. Following a hearing, conducted outside the presence of the jury, the court found that S.N.'s absence was understandable in light of her scared, stressed and fearful appearance. The court allowed the State's request to reopen its case-in-chief to present S.N.'s testimony as propensity evidence.

¶ 22    When the State subsequently called S.N. as a witness during the trial, the judge first advised the jury that it had received testimony related to D.C. and that it would now hear testimony from S.N., although no charges were pending in relation to either witness. The court also told the jury that this evidence should be considered by it only on the issues of defendant's propensity to have a sexual interest in persons of the same gender and age as the alleged victims and for the limited purpose of establishing defendant's motive and intent.

¶ 23    S.N. testified that she was placed in foster care at the age of 15 and came to live with Morris as a foster child when she was 17 years old. While S.N. was living with Morris, T.A. was also one of Morris's foster children. S.N. stated that Cathy was her babysitter and that Cathy often left her alone in defendant's care.

¶ 24    A few months after she moved into Morris's house, she visited defendant's home. According to S.N., defendant provided both S.N. and T.A. with alcohol. While the others in the house were sleeping, defendant engaged in vaginal intercourse with S.N. She explained that she did not stop defendant out of fear. S.N. testified that defendant had sexual intercourse with her on "several other" occasions. S.N. testified that she told Morris what happened, but that Morris told her to keep her mouth shut.

¶ 25    Cathy Groel testified for the defense. She stated that she was defendant's wife and Morris's daughter. She explained that Catholic Charities approved her as a babysitter for Morris's foster children. Cathy said that she never left the foster children alone with defendant because he was not an approved babysitter. She also testified that the foster children did not complain to her about defendant acting inappropriately.

¶ 26 Defense also called Sara Meyer, who testified that she was a caseworker with Catholic Charities and that through her employment, she learned that there were reported instances of lying by S.N. but she could not say that S.N. had a reputation of untruthfulness.

¶ 27 Defendant testified in his own defense. Defendant told the jury that he had been to the Department of Corrections for multiple convictions. Defense counsel asked defendant, "Tell us what your criminal history is." Defendant replied that he had criminal convictions for "tampering with evidence, dealing stolen property, theft, writing bad checks, forgery, unauthorized use of a credit card, simple possession for residue of crack cocaine, and that's to my knowledge. I can't remember much more. Those were all charges for supporting a crack habit." Defendant said that during the last seven years, he spent a considerable amount of time either in the county jail awaiting trial or in prison.

¶ 28 Defendant could not recall S.N. ever spending the night at his house. He stated that Cathy did not leave either S.N. or T.A. alone in his care. Defendant denied giving S.N. or T.A. alcohol or drugs.

¶ 29 Defendant said that he felt as close to D.C. as to his own children. Defendant explained that birth control was an issue for D.C. when she was placed with Morris. D.C. started taking birth control pills and promised defendant that she would keep taking the pills. He said the topic came up during their conversation while he was in jail. Defendant denied having any sexual contact with T.A., S.N., or D.C.

¶ 30 During cross-examination, the prosecutor asked the following series of questions:

"Q. Now, going back to your DUI with the crack cocaine, there was another count on that charge, is that right?

A. Yes, there was.

Q. And you forgot to mention that count to the jury initially, correct?

A. I did not forget to mention anything.

Q. The endangerment of a child?

A. That was part of the arrest, yes."

Defendant then stated that he pled guilty to that offense.

¶ 31 On June 1, 2009, the parties presented closing arguments. At the start of closing arguments, the prosecutor thanked the jurors on behalf of the State's Attorney's office and "most importantly on behalf of [S.N., T.A. and A.P.] for giving them the opportunity to have a voice and to tell you and share with you the things that happened." The prosecutor then outlined the evidence presented at trial and argued that the evidence proved defendant guilty.

¶ 32 During closing arguments, defense counsel said that the case "boils downs to these accusations" by "three troubled teenage foster children." Defense counsel argued that the jury should consider the timing of the complaint and the circumstances of the complaint. Defense counsel told the jury that T.A. did not complain about the alleged incident for 6½ years,

including 2½ years after T.A. turned 18 years old and left the foster care system.

¶ 33     In rebuttal, the prosecutor stated,

> "As far as the delay in reporting, the fact that these girls didn't go to Catholic, didn't go to DCFS, didn't go to the police right away, that they waited, and right now, even as we sit here now, there are thousands, maybe even millions of people walking around that have never told anyone, that never disclosed.
>
> Maybe they told a family member, but they never told the police, they never told anyone else. They've kept it inside, and that's what these girls did."

Following deliberations, the jury found defendant guilty of the offense of criminal sexual assault as alleged in count II of the indictment, but not guilty as to all other counts.

¶ 34     On July 1, 2009, the trial court denied defendant's posttrial motion and sentenced defendant to 15 years' imprisonment. On July 24, 2009, defendant filed a notice of appeal.

¶ 35                                        ANALYSIS

¶ 36     On appeal, defendant raises four claims of error. First, defendant claims the trial court erred by admitting evidence of uncharged sexual conduct. Second, defendant claims the trial court erred by admitting evidence of defendant's prior conviction for the misdemeanor offense of endangering the life and health of a child. Third, defendant claims the State failed to prove defendant guilty beyond a reasonable doubt of the offense of criminal sexual assault. Finally, defendant claims the prosecutor made improper remarks during closing arguments.

¶ 37                               I. Other Crimes Evidence

¶ 38     Defendant claims that the trial court committed reversible error when it allowed other crimes evidence to show propensity, intent and motive. The State responds that the trial court did not abuse its discretion in admitting the other crimes evidence.

¶ 39     A trial court's decision to admit other crimes evidence on propensity pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2008)) will not be reversed on appeal unless the trial court abused its discretion. *People v. Heard*, 187 Ill. 2d 36, 58 (1999). An abuse of discretion occurs if the trial court's decision is arbitrary, fanciful or unreasonable. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 40     To be admissible pursuant to section 115-7.3, the other crimes evidence should have some threshold of similarity to the charged offense. *People v. Boand*, 362 Ill. App. 3d 106, 122 (2005). The case law provides that the "actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest." *People v. Walston*, 386 Ill. App. 3d 598, 621 (2008). " 'As factual similarities increase, so does the relevance or probative value.' " *People v. Ross*, 395 Ill. App. 3d 660, 675 (2009) (quoting *People v. Wilson*, 214 Ill. 2d 127, 142 (2005)).

¶ 41    In this case, S.N. and D.C. were both teenage foster daughters placed in Morris's home and between the ages of 14 and 17 years of age at the time of the alleged improper conduct. S.N. described defendant engaging in vaginal intercourse with her at his home. Considering the similarities in gender, age, and the manner in which defendant met D.C., S.N., and T.A., we conclude that the evidence was similar and therefore relevant.

¶ 42    Next, we address defendant's contention that the trial court failed to conduct a balancing test when deciding to admit the other crimes evidence and that the prejudicial effect of the evidence outweighed its probative value. Even if a trial court fails to conduct a proper balancing test, a reviewing court must still determine whether reversible error occurred. *People v. Boyd*, 366 Ill. App. 3d 84, 95 (2006).

¶ 43    In this case, the record shows that the parties carefully addressed the issue of balancing the probative value of the propensity evidence in relation to its prejudicial effect to defendant. The case law requires a trial judge to engage in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence." *People v. Donoho*, 204 Ill. 2d at 186. A trial judge is presumed to know the law, and a reviewing court will ordinarily presume the trial judge followed the law unless the record indicates otherwise. *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996); *People v. Robinson*, 368 Ill. App. 3d 963, 976 (2006).

¶ 44    The other crimes evidence in this case provided the jury with a pattern of conduct relevant to defendant's motive and propensity when interacting with the female teenaged, foster care children while those children were left under the supervision of his wife for various reasons. See *People v. Deavers*, 220 Ill. App. 3d 1057, 1075 (1991). Accordingly, we conclude that the trial court did not abuse its discretion by admitting the other crimes evidence in this case.

¶ 45    Finally, defendant contends that the court erred by failing to admonish the jury before D.C.'s testimony was admitted as propensity evidence. It is true that the preferred practice "may be for trial courts to instruct the jury, not only at the close of the case, but also at the time other-crimes evidence is admitted, of the limited purpose for which it may consider the other-crimes evidence." *People v. Heard*, 187 Ill. 2d 36, 60-61 (1999) (citing *People v. Denny*, 241 Ill. App. 3d 345, 360-61 (1993)); Illinois Pattern Jury Instructions, Criminal, No. 3.14, Committee Note (3d ed. Supp. 1996)). However, our supreme court has held that the trial court's failure to follow this procedure does not mandate reversal. *People v. Heard*, 187 Ill. 2d at 61.

¶ 46    In this case, the trial court instructed the jury prior to S.N.'s testimony and advised the jury that the limiting instruction also applied to D.C.'s previous testimony. We note that portions of D.C.'s testimony were favorable to the defense and were not limited to propensity evidence alone. Moreover, the court again instructed the jury at the close of evidence regarding the limited nature of the propensity testimony.

¶ 47                    II. Defendant's Prior Conviction for the Offense of

                         Endangering the Health or Welfare of a Child

¶ 48        Defendant argues that the trial court erred by denying defendant's motion *in limine* and
committed reversible error when it also allowed the State to cross-examine defendant
regarding a misdemeanor conviction. Finally, defendant argues that prosecutorial misconduct
arose when the prosecutor failed to introduce a certified copy of the misdemeanor conviction
for endangering the health or life of a child into evidence.

¶ 49        Our supreme court has stated that "[t]here is no question that a defendant can open the
door to the admission of evidence that, under ordinary circumstances, would be
inadmissible." *People v. Harris*, 231 Ill. 2d 582, 588 (2008); see *People v. Jefferson*, 184 Ill.
2d 486 (1998). In cases where a defendant testifies on direct examination as to some prior
convictions but denies the existence of others or fails to testify to all convictions, the State
may question a defendant on cross-examination as to the convictions to which a defendant
did not testify. See *People v. Harris*, 231 Ill. 2d 582 (2008); *People v. Coleman*, 158 Ill. 2d
319 (1994); *People v. Bey*, 42 Ill. 2d 139 (1969); *People v. Nastasio*, 30 Ill. 2d 51 (1963).

¶ 50        In this case, defense counsel asked defendant, "Tell us what your criminal history is."
Defendant's answer implied that defendant had truthfully disclosed all of his previous
criminal convictions, and therefore, defendant "opened" the door on direct examination
regarding any inaccuracy in defendant's testimony regarding the extent of his criminal
history.

¶ 51        In this case, defendant minimized his prior record for the jury by testifying that his
previous convictions were attributable to a need to fund his ongoing addiction to a controlled
substance. The prosecutor cross-examined defendant concerning the fact that defendant's
recitation of his prior record deleted any reference to a misdemeanor conviction. We are
mindful that the omitted misdemeanor conviction did not appear to be related to obtaining
funds to support a drug habit. This was proper impeachment concerning the accuracy of
defendant's testimony on the subject of his prior record, which defendant introduced. Once
defendant admitted his omission concerning the misdemeanor conviction, impeachment was
completed. Moreover, since defendant admitted the conviction existed, a certified copy of
the conviction would have been cumulative. Since we find no reversible error in the State's
cross-examination of defendant, defense counsel cannot be considered ineffective for failing
to object to the questioning at trial.


¶ 52                              III. Reasonable Doubt

¶ 53        Defendant argues that the State failed to prove defendant guilty of criminal sexual assault
in violation of section 12-13(a)(4) of the Criminal Code of 1961 (720 ILCS 5/12-13(a)(4)
(West 2008)) as alleged in count II of the indictment because the evidence was insufficient
to prove that defendant held a position of trust, supervision or authority. Further, defendant
argues that T.A.'s testimony was inconsistent, lacked credibility, and was contrary to human

experience. The State responds that defendant was proved guilty beyond a reasonable doubt.

¶ 54    It is well established that when we review a challenge to the sufficiency of the evidence, the evidence must be viewed in the light most favorable to the prosecution to determine if any rational trier of fact could have found the essential elements of the offense were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 213 (2002); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Decisions regarding the credibility of witnesses and the weight which should be given to the witnesses' testimony are exclusively within the province of the jury. *People v. Collins*, 106 Ill. 2d at 261-62. A defendant's criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007) (citing *People v. Smith*, 185 Ill. 2d 532, 542 (1999)); *People v. Pollock*, 202 Ill. 2d at 213; *People v. Collins*, 106 Ill. 2d at 261.

¶ 55    In this case, it was undisputed that Morris was T.A.'s legal guardian and foster parent. It was also undisputed that, with regularity, Cathy provided babysitting services for T.A. at Cathy and defendant's house, while Morris played bingo on Thursday and Saturday nights.

¶ 56    T.A. testified she spent the night at defendant's house and on some occasions also provided babysitting services for Cathy's and defendant's two children whom she loved. T.A. told the jury, in the beginning, her relationship with defendant was similar to spending time with family. She explained, "we were family," and mentioned "we" went out to eat and "watched movies as a family," and "he was [a] nice regular guy, cool."

¶ 57    According to T.A., the familial relationship disintegrated after T.A. complained to Judy and Cathy that defendant had touched her inappropriately. According to T.A. the sexual contact with defendant stopped after she reported the abuse to Cathy and, in addition, defendant ceased speaking to her, started throwing things at her, and called her "names." T.A. stated she did not have any relationship with defendant after she reported him because "he was so mean." Based on this record, it was not unreasonable for the jury to conclude defendant held a position of trust, authority, or supervision over T.A., who considered defendant to be "family."

¶ 58    As to the inconsistencies in T.A.'s testimony, the defense used these inconsistencies in an attempt to discredit T.A. Clearly, the jury was faced with credibility decisions which were resolved in favor of T.A. Viewing the evidence in the light most favorable to the State, we conclude that the State sufficiently proved that defendant held a position of authority, supervision or trust when left alone with T.A.

¶ 59    IV. Prosecutor's Remarks During Closing Arguments

¶ 60    Defendant claims that the prosecutor sought to inflame the passions of the jury or arouse the jury's prejudice by thanking the jurors on behalf of S.N. and T.A. during closing arguments and that the prosecutor's remark in rebuttal, that there are thousands, if not millions, of people who have not disclosed sexual abuse, constituted misconduct, warranting

a new trial. Defendant concedes that he has forfeited the issue on appeal and is only entitled to relief if defendant can show that the remarks amounted to plain error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Dat Tan Ngo*, 388 Ill. App. 3d 1048, 1054 (2008). The State responds that the prosecutor's remarks were proper and non-prejudicial.

¶ 61　　A prosecutor's remarks during closing arguments will not justify reversal of a defendant's conviction unless the remarks resulted in substantial prejudice to a defendant (*People v. Cisewski*, 118 Ill. 2d 163, 176 (1987)), considering the content and context of the remarks in relation to the evidence and the effect on defendant's right to a fair trial. *People v. Kliner*, 185 Ill. 2d 81, 151-52 (1998). Moreover, prejudicial statements made by a prosecutor during closing arguments may be cured by the trial court's proper instructions as to the law. *People v. Simms*, 192 Ill. 2d 348, 396 (2000); *People v. Dat Tan Ngo*, 388 Ill. App. 3d at 1055.

¶ 62　　In this case, the prosecutor initially thanked the jurors on behalf of S.N. and T.A., but then spent the remainder of closing arguments addressing the merits of the case. Such generic, introductory comments did not arouse any prejudice from the jury and did not inappropriately focus "a spotlight on S.N." designed to elicit sympathy.

¶ 63　　Defendant's closing argument claimed that T.A. was not credible because she had not disclosed the allegations sooner. The prosecutor's remarks, made during rebuttal, were in response to defendant's closing argument. When defense counsel provokes a response, defendant cannot then complain that the prosecutor's remarks in rebuttal denied him a fair trial. *People v. Evans*, 209 Ill. 2d 194, 225 (2004); *People v. Montgomery*, 373 Ill. App. 3d 1104, 1116 (2007). Moreover, the trial court properly instructed the jury that the comments made by the attorneys during closing arguments should not be considered as evidence, thereby addressing any potential prejudice. See *People v. Desantiago*, 365 Ill. App. 3d 855 (2006); *People v. Graca*, 220 Ill. App. 3d 214 (1991). Since no reversible error occurred, neither plain error nor ineffective assistance resulted from defense counsel's failure to object to the prosecutor's remarks during closing arguments.

¶ 64　　　　　　　　　　　　　　CONCLUSION

¶ 65　　The judgment of the circuit court of Tazewell County is affirmed.

¶ 66　　Affirmed.