**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180704-U

Order filed July 13, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0704 Circuit No. 18-CF-339 |
| | ) | |
| ROBERT C. ROGERS, | ) ) | Honorable Michael D. Risinger, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice McDade concurred in the judgment.
Justice Holdridge concurred in part and dissented in part.

**ORDER**

¶ 1     *Held*:   The State presented sufficient evidence to sustain defendant's convictions on all counts, except for count IV, charging defendant with promoting juvenile prostitution. Further, defendant did not receive ineffective assistance of counsel.

¶ 2     The defendant, Robert C. Rogers, was charged with three counts of criminal sexual assault, one count of promoting juvenile prostitution, and three counts of aggravated criminal sexual abuse. Following a jury trial, the jury returned guilty verdicts on all seven counts.

Defendant appeals, challenging the sufficiency of the evidence and alleging he received ineffective assistance of counsel.

¶ 3                                                    I. BACKGROUND

¶ 4        On September 17, 2018, the State charged defendant by amended indictment with three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2016)), one count of promoting juvenile prostitution (count IV) (720 ILCS 5/11-14.4(a)(1) (West 2016)), and three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)). The amended indictment alleged that between October 1, 2017, and May 16, 2018, defendant knowingly committed an act of sexual penetration/sexual conduct in that he intruded/touched or fondled H.H.'s vagina with his fingers (counts I and V); knowingly committed an act of sexual penetration in that he made contact between his penis and H.H.'s vagina (counts II and VI); knowingly committed an act of sexual penetration in that he made contact between his mouth and H.H.'s vagina (counts III and VII), when he was 17 years of age or over and H.H. was at least 13 years of age but under 18 years of age, and held a position of trust, authority or supervision as to H.H. (counts I-III); or when H.H. was at least 13 years of age but under 17 years of age and defendant was at least 5 years older than H.H. (counts V-VII). Count IV alleged defendant knowingly solicited H.H. for the purpose of prostitution, offering H.H. money in exchange for an act of sexual penetration with an individual other than defendant when H.H. was under 18 years of age.

¶ 5        On September 17, 2018, defendant requested substitution of counsel where court-appointed counsel thought defendant was guilty and told defendant to accept a plea offer. In separate correspondence, defendant requested the suppression of statements he made to law

enforcement when he was denied counsel during a police interview. Defendant claimed he had difficulty hearing the questions asked during that interview due to a severe hearing impairment.

¶ 6        During a pretrial hearing on September 18, 2018, defendant explained to the court that he requested defense counsel to file a motion to suppress the statements he made to law enforcement during questioning, but counsel refused. Defendant complained that he was hearing impaired and did not hear the officer's questions properly. Defense counsel explained that after viewing defendant's audio/video-recorded interview, he determined the recording clearly showed defendant fully understood the questions asked of him and also signed two waiver of counsel forms. In addition, defense counsel made the following statement:

> "Judge, here's what I'd like to do. If [defendant] wants a motion to — I hadn't filed it because much of what he is saying I'd rather have not, never have been part of the record, but he's already let that cat out of the bag. So I would like to tender the video statement to you. I would like you to review it. I will file a motion to suppress, and even if we have to hear it immediately before [trial]."

Defendant then withdrew his request for a substitution of defense counsel.

¶ 7        On September 20, 2018, as promised, defense counsel filed a motion to suppress defendant's statements to law enforcement during a May 21, 2018, recorded interview at the East Peoria Police Department. The motion to suppress stated that defendant requested, but did not receive, counsel. The motion to suppress also alleged that defendant's hearing deficiency impeded his ability to knowingly and intelligently waive his rights and/or answer the officer's questions. The trial court conducted a hearing on defendant's motion to suppress the next day. The court heard testimony from defendant and detective Dave Catton, who interviewed defendant on May 21, 2018. Following arguments by counsel, the trial court denied defendant's

motion to suppress. Based on the contents of the recorded interview and the testimony presented during the hearing on the motion to suppress, the trial court found defendant knowingly waived his rights multiple times and determined defendant's testimony was not credible.

¶ 8                                           A. Jury Trial

¶ 9                                           1. Eli Rodgers

¶ 10        Defendant's jury trial began on September 24, 2018. Eli Rodgers, 16 years old, testified that he dated H.H. for approximately three years. H.H. lived with her mother, Donna, in a trailer park in Creve Coeur, Illinois, before living out of Donna's Jeep. Eventually, H.H. and Donna moved into a residence in East Peoria with defendant and John McMullen. Eli testified that H.H. sometimes referred to defendant as "Uncle."

¶ 11        Eli and H.H. communicated primarily over Facebook Messenger. At some point, H.H. provided Eli with the password to her Facebook Messenger account to allow Eli to access H.H.'s messages when H.H. did not have internet service. In May 2018, Eli logged into H.H.'s Facebook Messenger account and discovered sexual messages exchanged between defendant and H.H. Eli took screenshots of the messages and sent them to his older sister, who was a school counselor. Eli expected his sister would turn the images over to the police.

¶ 12                                          2. Nicole Rodgers

¶ 13        Nicole Rodgers, Eli's older sister and school counselor, recalled that in May 2018 her father requested that she speak with H.H. about issues pertaining to H.H.'s well-being. Nicole testified that she received screenshots from Eli's phone. Nicole identified People's exhibit No. 1 as a 19-page document containing photographs of the screenshots. According to Nicole, she made a report to the East Peoria Police Department on the same day that she received the screen shots from Eli.

¶ 14                                    3. Sergeant Chad LaCost

¶ 15        East Peoria Police Sergeant Chad LaCost testified that after Nicole shared the screenshots with Officer Roos, LaCost and Officer Roos immediately traveled to 132 Kenwood in East Peoria to conduct a wellness check. Defendant answered the door and the officers made contact with H.H. Donna was not present, but the officers eventually contacted her by phone.

¶ 16        The officers transported H.H. to the police station where they met Donna. Officer Roos posed some questions to determine whether the initial report warranted further investigation. The officers received permission from both H.H. and Donna to retain H.H.'s phone. Afterward, the officers generated a written report and referred the matter to the Children's Advocacy Center (CAC) for further investigation.

¶ 17                                    4. H.H.

¶ 18        H.H., 16 years old at the time of the trial, testified that her date of birth was September 27, 2001. H.H.'s mother's name was Donna, but H.H. had resided with her grandmother for most of her life. When she was approximately 14 years old, H.H. moved into a trailer park in Creve Coeur with Donna. When H.H. was 15 years old, Donna and H.H. were evicted from their trailer and spent the summer living in a Jeep.

¶ 19        According to H.H., in October 2017, H.H. and Donna moved into defendant's home. Donna's boyfriend, John McMullen, also resided in defendant's home. McMullen lived in the basement. H.H. and Donna shared a bedroom upstairs. Defendant occupied another separate upstairs bedroom. H.H. was happy to be living in a home, rather than living in a car. H.H. was homeschooled by Donna, however, Donna worked from early in the morning until late at night. Defendant worked nights and H.H. was generally home with defendant and McMullen during the day. McMullen spent most of his time in the basement. H.H. testified that defendant would

5

routinely make comments that Donna and H.H. would be forced to move out unless Donna paid rent to defendant.

¶ 20    H.H. testified that defendant touched her inappropriately for the first time in November 2017. At the time, Donna was working outside of the home and McMullen was in the basement. While H.H. was watching cartoon network in the living room, defendant began touching her breasts under her clothing. H.H. did not react because she was scared. H.H. could not recall if defendant touched her further that day, however, on later dates, defendant began to touch H.H.'s vagina.

¶ 21    According to H.H., defendant touched H.H.'s vagina with his hand, under her clothing, on multiple occasions. H.H. could not recall specific dates or times. On those occasions, Donna was not home, and McMullen was in the basement, leaving H.H. alone with defendant. H.H. explained that the incidents occurred in the living room, her room, and defendant's room. Defendant would rub and put his finger inside H.H.'s vagina. H.H. did nothing when defendant touched her because she was scared and did not know what to do. Regarding the incidents that occurred in the living room, H.H. recalled that she would either be watching Animal Planet or reading a book. H.H. testified that she would lock and block the door to her bedroom for safety, but defendant would use a butter knife to unlock the door.

¶ 22    H.H. testified that defendant also put his mouth on her vagina, underneath her clothing, on multiple occasions. H.H. could not recall how many times this happened. These incidents occurred in both the living room and H.H.'s room. McMullen was in the basement during the incidents, but Donna was never present in the home when defendant touched H.H. as described.

¶ 23    H.H. testified that defendant had sexual intercourse with her for the first time on the Saturday after Thanksgiving in 2017. H.H. recalled that on that day she was watching cartoons in

the living room when defendant sat down beside her, started touching her, and took her pants off. Defendant removed his pants, including his underwear, and put his penis inside of H.H.'s vagina. Defendant did not speak to H.H. during the incident. Afterward, H.H. experienced bleeding. H.H. could not estimate the number of times defendant had sexual intercourse with her. The incident occurred while McMullen was in the basement and Donna was at work.

¶ 24 H.H. recalled that she bled after the second time defendant had sexual intercourse with her, but not thereafter. In addition to the intercourse that occurred in the living room, defendant had intercourse with H.H. in both bedrooms. When H.H. told defendant she did not wish to have sexual intercourse, defendant would ignore her. H.H. stated that defendant thought he was her boyfriend and even asked H.H. to marry him. H.H. had no interest in having a relationship with or marrying defendant. These acts, including sexual intercourse, continued from the Saturday after Thanksgiving in 2017 until the police came to the residence in May 2018. According to H.H., she never spoke out because she was afraid that H.H. and Donna would be without a place to live.

¶ 25 H.H. testified that defendant communicated with her and Donna through Facebook Messenger. Defendant also left handwritten notes directed to H.H. and Donna around the home. H.H. identified People's exhibit Nos. 3-14[1] as the handwritten notes she and Donna received from defendant. H.H. kept defendant's handwritten notes hidden in her dresser to use as evidence if she reported defendant to law enforcement. H.H. read and explained the contents of defendant's handwritten notes to the jury.

¶ 26 The notes generally detailed chores defendant instructed H.H. to complete. For instance, one note asked H.H. to clean the cat box and the floor, take out the trash, pick up her room,

---

[1]People's exhibit Nos. 3-14 were admitted into evidence.

vacuum her carpet, take a shower, walk the dog, and feed the animals. The note additionally stated that defendant's daughter would be inspecting H.H.'s room. Some notes included language indicating that defendant loved H.H. Other notes from defendant threatened that defendant would restrict H.H.'s internet access and stated that defendant planned to kick H.H. and Donna out of the home. For example, People's exhibit No. 9, from defendant to H.H., read:

> "Babe all this about moving out would stop if you f*** me. Then 2 times a week wouldn't be bad. You know if you do this for me today without Max just either on your bed or mine. I would tell your mom a fib that I let you stay. But only if you f*** me today. Why put the animals and your mom in jeopardy and no place to live. All you have to do is do it with me in a few minutes and I'll call off the moving."

¶ 27 During her testimony, H.H. identified People's exhibit No. 1 as a 19-page document containing Facebook messages from defendant.[2] The Facebook messages dated from February 2, 2018, to April 12, 2018, asked for sex and/or offered to pay H.H. for sex. Defendant also offered to exchange Wi-Fi access for sex. In one Facebook message, defendant told H.H. that she needed "to get close to [McMullen] to make up. You know how the way you did me." H.H. testified that she did not have sex with McMullen.

¶ 28 In another Facebook message to H.H., defendant wrote, "you either put out or get out." Defendant also threatened to take back the laptop he bought H.H. if H.H. did not engage in sexual relations with him.

¶ 29 H.H. testified that there were occasions where defendant mentioned giving H.H. money in exchange for sex with him. H.H. recalled three or four times that defendant gave her $100 while she lived in his home. This occurred following sexual acts. According to H.H.'s testimony,

---

[2]People's exhibit No. 1 was admitted and published without objection.

she did not agree to perform sexual acts with defendant in exchange for money. H.H. testified that occasionally defendant gave her money and she accepted it "because he already did it so why not."

¶ 30     H.H. identified People's exhibit No. 16 as 24 pages of additional Facebook messages exchanged between H.H. and defendant between May 5, 2018, and May 16, 2018.[3] H.H. read and/or explained the contents of the Facebook messages to the jury. The Facebook messages contained defendant's requests for sexual acts from H.H., defendant's plans to kick H.H. and Donna out of the home, defendant's threats to exercise control over H.H.'s internet access, and defendant's requests to marry H.H., among other things. In one Facebook message, defendant offered to pay H.H. $100 to have sex with McMullen, but H.H. responded that she did not wish to have sex with McMullen.

¶ 31     H.H. testified that on May 16, 2018, officers arrived at defendant's home and then took her to the police station. H.H. told officers about hickeys on her neck that defendant had given her, and she identified People's exhibit No. 17 as a photograph of hickeys on her neck that Donna had taken.[4]

¶ 32     H.H. participated in an interview at the Tazewell County CAC on May 18, 2018. H.H. told the interviewer about the hickeys and that defendant inappropriately touched her. During this first CAC interview, H.H. did not talk about sexual intercourse or mouth to vagina contact.

¶ 33     Afterward, a detective informed H.H. that defendant had confessed to having sexual intercourse with H.H. and requested that H.H. participate in another CAC interview. H.H. returned to the CAC for a second interview. During the second CAC interview, H.H. told the

---

[3]The State admitted People's exhibit No. 16.
[4]The State admitted People's exhibit No. 17.

9

interviewer the entire story, the same story she related to the jury. H.H. was placed in foster care after the second interview.

¶ 34　　　　On cross-examination, H.H. testified that defendant did not have authority over her, the right to supervise her or the right to tell her what to do. H.H. testified that she did not consider defendant to be a stepfather figure. On redirect examination, H.H. stated that she never wanted to have sexual intercourse with defendant. H.H. recalled that defendant did sometimes tell her what to do. Defendant instructed H.H. to complete chores around the house, which H.H. completed. Defendant instructed H.H. not to talk to boys on the internet and advised H.H. to get a GED, even though Donna did not advise H.H. to get a GED. H.H. testified that on one occasion she told defendant she was going to her uncle's home, rather than Eli's home, because defendant did not like Eli. H.H. believed defendant would have kicked her out of the home if he knew that H.H. visited with Eli at Eli's home.

¶ 35　　　　　　　　　　　　5. Detective David Catton

¶ 36　　　　East Peoria Police Department Detective David Catton testified that after the officers posed some initial questions to H.H., H.H. was interviewed at the CAC. According to Catton, all CAC interviews are recorded. After H.H.'s initial interview at the CAC, Catton contacted defendant, who voluntarily appeared at the police department for an interview on May 21, 2018. Catton identified People's exhibit Nos. 18 and 19[5] as defendant's audio/video recorded interview. The interview was published to the jury in open court. Defendant's interview includes defendant's multiple confessions to having a sexual relationship with H.H.

_____

[5]People's exhibit No. 19 was a redacted copy of the full interview. People's exhibit Nos. 18 and 19 were admitted by stipulation.

10

¶ 37    Catton testified that following defendant's confessions, H.H. participated in a second CAC interview based on the information learned during defendant's interview. Following Catton's testimony, the State rested.

¶ 38                                    B. Defense Evidence

¶ 39    In addition to presenting brief testimony from defendant's ex-wife and his coworker, the defense also presented the testimony of the other tenant within defendant's home, John McMullen. McMullen testified that he began living in defendant's basement in 2014. When Donna and H.H. moved into defendant's home in 2017, McMullen was in a dating relationship with Donna. On cross-examination, McMullen testified that he was previously convicted of the criminal sexual assault of a 14-year-old in 2008. McMullen denied having conversations with defendant about H.H. that were sexual in nature. McMullen also denied discussing with defendant the possibility of H.H. having sexual intercourse with McMullen in exchange for money.

¶ 40    Defendant, 60 years of age, testified on his own behalf and denied giving H.H. hickeys, touching H.H.'s breasts, touching H.H.'s vagina, placing his mouth on her breasts or vagina, and having sexual intercourse with H.H. In October 2017, defendant agreed to allow Donna and H.H. to move into his home. Donna agreed to share expenses with defendant but only paid him $50 during the eight months Donna and H.H. lived in defendant's home.

¶ 41    Defendant testified that in October 2017, H.H. approached defendant and asked him to make love to her, but defendant declined. According to defendant, H.H. approached defendant on several additional occasions with the same question. On one occasion, H.H. sat on top of defendant, held a knife to his throat, and asked defendant to make love to her because she wanted a baby. When defendant told H.H. no, she pulled his penis out of his shorts and cut it with a

11

knife. Defendant claimed he had marks on his penis from the incident, which he identified in Defense exhibit No. 1.[6] Afterward, H.H. took $100 from defendant's wallet. H.H. told defendant that if he told anyone what happened she would call the police and tell them defendant sexually assaulted her. When defendant first asked Donna and H.H. to move out in January 2018, H.H. became very angry, grabbed a steak knife out of the drawer, looked at defendant, and stabbed an orange.

¶ 42 During his testimony, defendant denied sending H.H. the Facebook messages in question and claimed he was "hacked." Defendant also denied writing the handwritten notes. Defendant testified that his statement to the police that he and H.H. had sexual intercourse several times was inaccurate. Instead, defendant and H.H. would hug and lay on top of one another with their clothes on. Defendant explained that he had suffered from erectile dysfunction for the last 10 years. The defense rested following defendant's testimony.

¶ 43                                    C. Rebuttal Evidence

¶ 44 In rebuttal, the State called Jessica Flynn, a nurse at the Tazewell County Jail, to testify. After viewing Defendant's exhibit No. 1, Flynn detected what appeared to be the presence of genital warts or herpes.

¶ 45                              D. Verdict and Posttrial Proceedings

¶ 46 Following closing argument and deliberation, the jury found defendant guilty on all counts. On October 22, 2018, the trial court appointed new posttrial counsel for defendant. On November 5, 2018, defendant filed a motion for judgment notwithstanding the verdict or for a new trial. In his posttrial motion, defendant argued the State failed to prove him guilty beyond a reasonable doubt, alleged ineffective assistance of counsel related to the testimony concerning

---

[6]Defense exhibit No. 1 included three photographs of defendant's penis and was admitted into evidence.

12

the CAC interviews, among other things, and argued he was denied due process and a fair trial because accommodations for his deficient hearing were not adopted for purposes of the trial.

¶ 47        On November 27, 2018, the trial court conducted a hearing on defendant's posttrial motion. During the hearing, defense counsel testified about his trial preparation and pretrial conversations with defendant. Defense counsel explained his reservations about filing the pretrial motion to suppress defendant's recorded statements to law enforcement. Defense counsel described defendant's claims that he misunderstood the detective's questions as incredible and that he "almost felt disingenuous presenting [the motion to suppress] to the Court, but that was [defendant's] wish and that's what [defendant] got."

¶ 48        Further, defense counsel testified that he introduced the photographs of defendant's penis to corroborate defendant's story about the wounds defendant sustained after H.H. cut defendant's penis with a knife. However, defense counsel stated it was clear to him that the photographs depicted defendant's genital warts, not an old wound, and admitted the photographs painted defendant in a bad light. The trial court denied defendant's posttrial motion and the cause proceeded to sentencing.

¶ 49        The trial court imposed consecutive prison sentences of 4 years on count I, 12 years on count II, 8 years on count III, and 4 years on count IV.[7] On November 29, 2018, defendant filed a motion to reconsider his sentences, which the trial court denied the same day. Defendant appeals.

---

[7]Defendant was not sentenced on counts V, VI, and VII based on one-act, one-crime principles.

13

¶ 50                                  II. ANALYSIS

¶ 51        On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt of counts I-IV, that the jury was improperly instructed regarding count IV, and that defendant was denied effective assistance of counsel.

¶ 52                        A. Sufficiency of the Evidence (Counts I-III)

¶ 53        Defendant opens his appeal by arguing the State's evidence was insufficient to sustain convictions on counts I-III, which alleged defendant committed several acts constituting criminal sexual assault. Defendant contends the State's evidence failed to establish a critical element of the charged offenses, namely, that defendant occupied a position of trust, authority or supervision over H.H. Defendant urges this court to reverse his convictions and vacate the sentences he received on counts I-III and remand the matter for resentencing on the lesser-included offenses alleged in counts V-VII. The State submits that any rational trier of fact could have found defendant guilty of counts I-III.

¶ 54        When faced with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, viewing the evidence in the light most favorable to the prosecution, a reviewing court is tasked with determining whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 55        It is the responsibility of the trier of fact to determine the credibility of the witnesses, weigh the testimony, resolve conflicts in the evidence, and draw reasonable inferences that flow from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000); *People v. Young*, 128 Ill. 2d 1, 49 (1989). Reviewing courts must give due consideration to the reality that the trier of fact

14

saw and heard the witnesses and the evidence firsthand. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Ultimately, "[t]he testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *Id*. Furthermore, a conviction may be sustained solely on circumstantial evidence as well as upon direct evidence. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005). A defendant's conviction will only be overturned based on insufficient evidence where the proof is so improbable or unsatisfactory that a reasonable doubt as to the defendant's guilt remains. *Williams*, 193 Ill. 2d at 338; *People v. Washington*, 2012 IL 107993, ¶ 33.

¶ 56　　　　To review, the jury convicted defendant of three counts of criminal sexual assault pursuant to section 11-1.20(a)(4) of the Criminal Code of 2012 (the Code). 720 ILCS 5/11-1.20(a)(4) (West 2016). A person commits criminal sexual assault if that person commits an act of sexual penetration, is 17 years of age or over, holds a position of trust, authority, or supervision in relation to the victim, and the victim is at least 13 years of age but under 18 years of age. *Id*.

¶ 57　　　　Here, defendant concedes he was over 17 years of age and committed the sexual acts with H.H., a person that was at least 13 years of age but under 18 years of age at the time. However, defendant argues the State's evidence was insufficient to prove he held a position of trust, authority, or supervision over H.H.

¶ 58　　　　The parties correctly point out that section 11-1.20(a)(4) does not define the terms trust, authority, or supervision. *Id*. Nonetheless, this court has previously defined these terms according to their ordinary and popular meanings as follows:

　　　　" '[Trust] as [c]onfidence in the integrity, ability, character, and truth of a person * * *[;] [s]omething committed into the care of another. [citation]. Authority is [t]he power to command, enforce laws, exact obedience, determine, or judge. [citation].

15

Supervise or supervision means [t]o direct and inspect the performance of [citation]; the act of overseeing or inspection [citation]; to superintend or oversee [citation].' " (Internal quotation marks omitted.) *People v. Secor*, 279 Ill. App. 3d 389, 396 (1996).

¶ 59   In enacting this provision, it is evident "the legislature sought to prevent sex offenses by those whom a child would tend to obey, such as a teacher or coach, as well as those in whom the child has placed his trust[.]"[8] *People v. Grocesley*, 384 Ill. App. 3d 682, 685 (2008) (quoting *Secor*, 279 Ill. App. 3d at 396).

¶ 60   On appeal, defendant describes his relationship with H.H. as a "business relationship," wherein H.H. and Donna were expected to pay rent, help with expenses, and occasionally complete chores to be permitted to reside in defendant's home. On this basis, defendant distinguishes the facts in the instant case from the facts in other cases where similarly situated defendants were found to be in positions of trust, authority, or supervision in relation to their victims. *Grocesley*, 384 Ill. App. 3d at 683 (where the defendant coached track in the 15-year-old victim's high school district); *People v. Feller*, 2012 IL 110164, ¶¶ 4, 14 (where the defendant's presence was necessary to help the blind 14-year-old victim swim into a lake); *People v. Groel*, 2012 IL App (3d) 090595, ¶¶ 11, 57 (where the defendant's wife babysat the 14-year-old victim and where the victim characterized the defendant as like family). Defendant's argument is not persuasive.

¶ 61   With respect to the evidence pertaining to defendant's authority, it is undisputed that defendant was often alone on the main floor of his home with H.H. when Donna was at work and McMullen was in the basement. All parties agree that defendant was the head of the household.

---

[8]We note that the *Feller*, *Grocesley, and Secor* decisions we cite analyzed the previous iteration of the criminal sexual assault statute, 720 ILCS 5/12-13(a)(4), which was subsequently renumbered as 720 ILCS 5/11-1.20(a)(4), eff. July 1, 2011, without material changes to the language regarding the defendant's position of trust, authority, or supervision.

16

Based on this status, defendant directed H.H. to perform household chores. If H.H. failed to comply with those directives or rebuffed his sexual advances, defendant frequently reminded H.H. of his authority over H.H. and her mother by threatening to kick H.H. and Donna back out onto the street. This was not an idle threat. Defendant had the authority to evict H.H. and Donna from his home. In addition, on a much smaller scale, defendant controlled access to the internet in his home. On occasion, defendant, who was 40 years older than teenaged H.H., restricted H.H.'s access to the internet, presumably to punish H.H. for not complying with defendant's commands.

¶ 62       It is apparent that the legislative intent behind the statute was to address factual scenarios where a victim would be more vulnerable to a sexual assault based on the victim's relationship with his or her attacker. In other words, the relevant question becomes whether there was a heightened risk of H.H. becoming the victim of a sexual assault due to defendant's relationship to H.H. See *People v. Kaminski*, 246 Ill. App. 3d 77, 81 (1993). Even if we were to hold that the State's evidence failed to establish defendant was in a position to exert undue influence over H.H., which we do not, at minimum, the circumstances present here, including defendant's purported "business relationship" as H.H.'s landlord, provided him with readily available opportunities to be alone with H.H. Clearly, defendant was able to secretly maintain a sexual relationship with H.H. that was not discovered by Donna due to the opportunity his position in the household provided.

¶ 63       Accordingly, it was within the province of the jury to accept or reject defendant's assertion that his "business relationship" with H.H. did not involve trust on H.H.'s part and did not involve defendant's exercise of authority or supervision over H.H. It was further within the province of the jury to reject H.H.'s claim that defendant did not have any authority over her

17

when these statements were contradicted by other direct evidence. When testifying, Eli stated that sometimes H.H. referred to defendant by using the term "Uncle."

¶ 64 After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. For these reasons, we reject defendant's arguments pertaining to the insufficiency of the evidence on counts I-III.

¶ 65 B. Sufficiency of the Evidence (Count IV)

¶ 66 At the outset, both parties agree the offense of promoting juvenile prostitution, as charged in count IV, stemmed from the allegation that defendant arranged for H.H. to engage in sexual relations with McMullen and offered H.H. money to do so. With this context in mind, defendant submits that a reasonable interpretation of the language of section 11-14.4(a)(1) requires the State to prove that H.H. was an active, working prostitute, before defendant acted on her behalf. 720 ILCS 5/11-14.4(a)(1) (West 2016).

¶ 67 Conversely, the State submits that a reasonable reading of section 11-14.4(a)(1) does not require the State to prove, beyond a reasonable doubt, that H.H. was an active, working prostitute, in order for defendant to be guilty of promoting a juvenile prostitute. Alternatively, the State argues that if we accept defendant's proposed construction of the applicable statute, the State's evidence was sufficient because H.H. arguably engaged in prostitution by performing sexual acts for defendant and then accepting the cash defendant offered.

¶ 68 It is well established that the starting point for any question of statutory construction is to determine and give effect to the intent of the legislature based on the plain language of the statute, which should be given its plain and ordinary meaning. *People v. Fiveash*, 2015 IL

18

117669, ¶ 11. A statute should be read as a whole, and all of its relevant parts should be considered to determine legislative intent. *People v. Thoma*, 152 Ill. App. 3d 374, 375 (1987).

¶ 69    First, section 11-14(a) addresses the acts that fall within the parameters of prostitution in general. 720 ILCS 5/11-14(a) (West 2016). This section states: "Any person who knowingly performs, offers or agrees to perform any act of sexual penetration as defined in Section 11-0.1 of this Code for anything of value, or any touching or fondling of the sex organs of one person by another person, for anything of value, for the purpose of sexual arousal or gratification commits an act of prostitution." *Id*.

¶ 70    The statutory language embodied in section 11-14.4(a)(1) addresses those acts that fall within the parameters of promoting juvenile prostitution, as opposed to prostitution in general. 720 ILCS 5/11-14.4(a)(1) (West 2016). Section 11-14.4(a)(1) specifies that a person "advances prostitution as defined in Section 11-0.1, where the minor engaged in prostitution, or any person engaged in prostitution in the place, is under 18 years of age or is a person with a severe or profound intellectual disability at the time of the offense." *Id*.

¶ 71    The language of Section 11-0.1 defines "advances prostitution" as follows:

"(1) Soliciting for a prostitute by performing any of the following acts when acting other than as a prostitute or a patron of a prostitute:

(A) Soliciting another for the purpose of prostitution.

(B) Arranging or offering to arrange a meeting of persons for the purpose of prostitution.

(C) Directing another to a place knowing the direction is for the purpose of prostitution." 720 ILCS 5/11-0.1(A)-(C) (West 2016).

19

¶ 72        Finally, Merriam-Webster provides the word "advance" means "to accelerate the growth or progress of" or "to bring or move forward." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/advance (last visited Apr. 8, 2021).

¶ 73        Existing case law further provides some guidance by construing similar language that was previously set out in a repealed version of the statutory scheme. Before discussing this case law, we note that section 11-14.4(a), which bears an effective date of July 1, 2011, repealed several predecessor statutes that have been construed by reviewing courts, namely, sections 11-15 and 11-15.1, among others. 720 ILCS 5/11-15; *Id.* § 11-15.1.[9] Importantly, predecessor sections 11-15(a) and 15.1(a) define the charge of soliciting for a prostitute and/or a juvenile prostitute in nearly identical fashion to section 11-0.1(A)-(C)'s current definition of advancing prostitution.

¶ 74        While not directly on point, in *People v. Jones*, 245 Ill. App. 3d 810 (1993), the Fourth District construed the language of sections 11-15 and 11-15.1. *Jones* is helpful for purposes of resolving the issue raised in this appeal. 720 ILCS 5/11-15 (West 1992); *Id.* § 11-15.1. The *Jones* court, noting the holdings in several related decisions, held that the statute covers only "middlemen," those who act on behalf of a prostitute in procuring customers. *Jones*, 245 Ill. App. 3d at 813-15. The *Jones* court further observed that sections 11-15 and 11-15.1, as they existed at that time, were drafted "to insure coverage of all acts by the 'runner' or the 'middle-man' in arranging business for a working prostitute. *** The modern day practice of prostitution relies heavily upon mobility and an informal intelligence service to establish contacts between prostitute and patron." (Emphasis omitted.) *Id.* at 814-15 (citing Ill. Ann. Stat., ch. 38, ¶¶ 11-15, Committee Comments at 341-42 (Smith-Hurd 1979).

_____

[9]Sections 11-15 to 11-17.1 were repealed by P.A. 96-1551. Section 11-14.4 was added by P.A. 96-1551.

¶ 75    We have considered the language included in the applicable version of the statute at issue in this appeal, together with case law interpreting similar language in a prior version of the same statute. Based on these two considerations, we agree with defendant's construction of the statute and conclude that section 11-14.4(a)(1) requires a showing by the prosecution that defendant was acting on behalf of an active, working, juvenile prostitute.

¶ 76    Next, we consider the State's contention that the evidence was sufficient to prove, beyond a reasonable doubt, that H.H. conducted herself as an active, working, juvenile prostitute before defendant suggested that he would pay H.H. to perform sex acts with McMullen. The evidence does not support the State's contention.

¶ 77    It is very evident that defendant's threats to evict H.H. and her mother unless H.H. "put out," became the motivating factor for H.H. to succumb to unwanted sexual advances initiated by defendant. The fact that defendant occasionally, but not routinely, gave H.H. cash, perhaps as incentive for her silence, does not convert a child into a juvenile prostitute. Consequently, defendant's conviction for promoting juvenile prostitution is reversed.

¶ 78                          C. Improper Jury Instructions: Count IV

¶ 79    Next, defendant argues the non-Illinois Pattern Jury Instructions the jury received for the offense of promoting juvenile prostitution, as alleged in count IV, failed to apprise the jury that H.H.'s status as a juvenile prostitute was an element of the offense. However, based on our reversal of defendant's conviction on count IV, defendant's argument is moot concerning the propriety of these instructions.

¶ 80                          D. Ineffective Assistance of Counsel

¶ 81    Finally, defendant argues defense counsel provided ineffective assistance based on defense counsel's decisions to (1) file a frivolous motion to suppress; (2) introduce corroborating

evidence in the form of unflattering photographs of defendant's penis; and (3) allow inadmissible prior consistent statements to be introduced by the State without objection. The State argues defense counsel's performance was objectively reasonable and that defendant cannot establish counsel's errors, if any, prejudiced defendant. We agree with the State.

¶ 82 To demonstrate ineffective assistance of counsel on appeal, a defendant must show (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Matters of trial strategy are generally immune from ineffective assistance claims. *Manning*, 241 Ill. 2d at 327.

¶ 83 Prior to trial, defendant wrote to the court on several occasions requesting a new attorney and the suppression of various statements. The transcript of the hearing when the court addressed defendant's requests reveals that defendant demanded the appointment of an attorney that would agree to file a motion to suppress. To appease defendant, both the court and counsel agreed the court would watch the recorded interview and counsel would file a motion to suppress.

¶ 84 On appeal, defendant argues counsel should have gone against his wishes and refused to file the meritless motion to suppress that defendant demanded. Despite defendant's stance on appeal, the motion to suppress was not wholly without merit because defendant's hearing deficiency is uncontested. Moreover, the record does not lend support to defendant's unsupported contention that the filing of the motion to suppress in some way pitted the trial court against defendant or defense counsel, thereby increasing the sentence defendant received. Defendant offers nothing more than pure speculation to support such a claim. For these reasons, trial counsel was not ineffective for filing the motion to suppress.

¶ 85        Next, the State concedes that defense counsel provided ineffective assistance by introducing photographs of defendant's penis into evidence. During a posttrial hearing, defense counsel admitted he was not persuaded that the photographs documented a wound inflicted by H.H. as defendant alleged. In fact, defense counsel believed the photographs of defendant's penis painted defendant in a worse light. Accordingly, we accept the State's concession of error pertaining to defense counsel's deficient performance.

¶ 86        Following the State's concession on this issue, defendant must show a reasonable probability exists that, but for the admission of the photographs, the result of the proceeding would have been different. Defendant makes no such showing. The evidence at trial established defendant's guilt in overwhelming fashion, rendering the admission of the unflattering photographs harmless.

¶ 87        Defendant argues defense counsel improperly failed to object to the trial testimony that H.H. made prior consistent statements to law enforcement during her CAC interviews concerning defendant's sexual misconduct. Here, prior to trial, both the court and the State agreed the substance of H.H.'s CAC interviews was inadmissible. However, the fleeting references to the CAC interviews during trial arguably benefitted defendant where the testimony established that H.H. told differing stories during her two CAC interviews, damaging her credibility. Thus, defense counsel's decision not to object to the testimony was arguably the result of a reasonable trial strategy. Moreover, we find the brief references to the CAC interviews, if erroneous, constituted harmless error in light of the overwhelming evidence against defendant. Thus, defendant has not established that he received ineffective assistance from defense counsel.

¶ 88     To conclude, we affirm defendant's convictions on counts I-III and V-VII. Defendant's conviction on count IV is reversed due to insufficient evidence.

¶ 89                                  III. CONCLUSION

¶ 90     The judgment of the circuit court of Tazewell County is affirmed in part and reversed in part.

¶ 91     Affirmed in part and reversed in part.

¶ 92     JUSTICE HOLDRIDGE, concurring in part and dissenting in part:

¶ 93     I agree with the majority's judgment with the exception of its resolution of count IV (promoting juvenile prostitution). I would find that a plain reading of the statutory language and the evidence of record demonstrates that the State met its burden to sustain the conviction. Therefore, I would affirm the defendant's appeal in its entirety.